***********
The undersigned have reviewed the record and the prior Decision and Order filed by Deputy Commissioner Houser. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, or amend the Decision and Order.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Order, which was admitted into the record, and marked as Stipulated Exhibit (1) as:
 STIPULATIONS
1. All parties are properly brought before the Industrial Commission, which has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff was born on 12 December 1980. Plaintiff was is twenty-two (22) years of age at the time of the hearing before the Deputy Commissioner. Plaintiff was diagnosed as having Fetal Alcohol Syndrome at birth, with both of her parents being identified as alcoholics. Plaintiff completed the eighth grade, but dropped out of school during the ninth grade. Plaintiff's IQ is fifty-nine (59).
2. Between the ages of eight and ten, plaintiff reported being raped by her uncle. At approximately age eleven (11), plaintiff was removed from her home due to neglect, abuse, and uncontrollable behaviors. Thereafter, plaintiff was placed in numerous foster homes.
3. In addition to being diagnosed with Fetal Alcohol Syndrome, plaintiff has also been diagnosed with the following: Mental Retardation; Conduct Disorder; Schizo-affective Disorder; Major Depressive Disorder with Psychotic Features; Post-Traumatic Stress Disorder; Impulse Control Disorder; Bipolar Affective Disorder, and; Anti-Social Personality Disorder. Plaintiff has been hospitalized for psychiatric reasons on at least twenty (20) occasions. Plaintiff has attempted suicide numerous times, is known to bang her head, and has burned herself with cigarettes.
4. At the age of eighteen (18), plaintiff was declared mentally incompetent, and Wake County Human Services appointed a Guardian ofPerson, who currently is Ms. Karen Johnson. On 13 July 1999, plaintiff was transferred from the Adolescent Unit on the Dorothea Dix campus, to the Adult Women's Unit (NCCIW), which also referred to as the Women's Prison. Since 19 October 1999, plaintiff has been incarcerated at NCCIW on nine occasions.
5. On 24 August 2000, plaintiff was again transferred to NCCIW from Dorothea Dix Hospital. Subsequently, except for several brief periods when she was in the NCCIW Segregation Unit, plaintiff was incarcerated exclusively in the NCCIW Inpatient Acute Mental Health Unit. NCCIW personnel were aware of plaintiff's history of banging her head and attempting to harm herself in other ways, and of her propensity to display inappropriate behavior towards others. This knowledge of inappropriate behavior specifically included knowledge of plaintiff's history of spitting at others. Prior to the incident giving rise to this claim, and because of plaintiff's behavioral history, she had been placed in four point restraints on multiple occasions.
6. On 30 March 2001, plaintiff was being housed in cell No. 4 of the Acute Mental Health at NCCIW. On that date, plaintiff became agitated and her behavior grew progressively harmful to herself, and to those around her. Plaintiff bit buttons of her dress, and threatened to swallow them. She repeatedly tore her gown, and made suicidal threats. At one point, plaintiff tied a piece of elastic around her neck, untied it, and then placed then it in her vaginal area.
7. Throughout this episode of agitated behavior, plaintiff refused to comply with directions given from defendant's staff. At 11:45 a.m., Nurse Kimberly Bronson documented that plaintiff had begun banging her head, and was refusing instructions to stop. Due to the nature of plaintiff's behavior, Nurse Bronson telephoned Dr. Kim Brydon, plaintiff's treating psychiatrist, who then ordered that defendant's staff remove everything from plaintiff's cell. Thereafter, Correction Officers Gloria Bullock, Tracy Walker, Cynthia Curry, Veronica McCants, along with Sergeants Moore, Walker and Sergeant Tony Spearman were called to the scene. By approximately 12:05 p.m., correctional officers had removed all items from plaintiff's cell without use of force.
8. At approximately 12:55 p.m., plaintiff's head banging intensified. Dr. Brydon then ordered that plaintiff be secured with the use of 4-point restraints. Nurse Bronson then informed Correctional Officer Bullock of Dr. Brydon's order, who in turn called Sergeant. Walker, who then called Sergeant Spearman and other officers to assist with this procedure. At approximately 1:24, Officers Curry, Bullock, and McCants, along with Sergeants Moore and Walker, all female staff members, entered plaintiff's cell. Sergeant Spearman, a male staff member, remained outside the cell door to record events in the cell as called for by defendant's "Use of Force" records. There was also testimony at the hearing that another reason Sergeant Spearman, who was the senior official at the scene, was outside the cell was because plaintiff's clothes had been removed in order to apply the restraints. Once the officers had applied the restraints and a helmet, the nurses were requested to check the restraints to make certain these were properly secured. At this point, plaintiff was strapped into a bed with attachments at both wrists and ankles. As Nurse Michael Pendleton was checking the restraints, plaintiff began moving and attempted to sit up, so Nurse Pendleton determined that the restraints needed to be tightened.
9. As plaintiff continued attempting to sit up, Sergeant Spearman entered the cell and positioned himself between the wall, and the head of the bed. The evidence is unchallenged that upon entering the cell, Sergeant Spearman applied pressure to plaintiff's shoulders that had the effect of holding her down while others were attempting to secure the restraints. While Sergeant Spearman was holding plaintiff down, she spit in his direction. Upon that occurring, Sergeant Spearman reacted spontaneously, hitting plaintiff in the face with a closed right fist, while also turning her head to the left in an attempt to restrain her from spitting. Next, following a period of approximately thirty (30) seconds, plaintiff again spit in the direction of Sergeant Spearman, who again immediately responded with a closed fist blow in an effort to restrain her from spitting.
10. The reason for, or cause of Sergeant Spearman's entrance into the cell was an issue of controversy at the hearing before the Deputy Commissioner. Defendant contends that Sergeant Spearman entered the cell upon his own volition when the situation did not call for his involvement, and that he was not requested, or authorized to do so. Supporting this contention, Officer Bullock testified that Sergeant Spearman was not requested to enter the cell, and that his entry was not necessary because plaintiff was complying with instructions. Similarly, Sergeant Walker testified at the hearing that at the time Sergeant Spearman entered the cell, his presence was not needed.
11. However, much of defendant's employees' testimony offered at the hearing directly contradicts statements given earlier to Captain Roger Lee as part of the Department of Corrections' Internal Investigation Report. In her interview with Captain Lee on 31 March 2000, Officer Bullock reported that when Sergeant Spearman entered the cell, plaintiff was struggling to sit up, and that he assisted with holding her down while the restraints were being secured. Sergeant Walker was also interviewed by Captain Lee on 31 March 2000, and likewise reported that when Sergeant Spearman entered the cell plaintiff was "wiggling" and struggling to free herself from the restraints. Supporting Officer Bullock's and Sergeant Walker's statements to Captain Lee are statements given by Officer Curry, who is no longer employed by defendant. To Captain Lee, Officer Curry reported that other officers, who were already in the cell, had in fact requested that Sergeant Spearman enter so as to assist with holding plaintiff's head and shoulders down while the chest strap was secured.
12. The statements given to Captain Lee as part of defendant's internal investigation were given the day following the incident in question, when the memory of events were fresh, and prior to the commencement of litigation. The undersigned also notes that the differences between these statements and the testimony at the hearing are not subtle, but rather are stark and direct, and happen to coincide with defendant's overall theory of the case. Accordingly, the undersigned gives great weight to the statements given to Captain Lee that are part of the Department of Corrections' Internal Investigation Report, while finding the contradictory testimony by the same staff members at the hearing not to be credible. Moreover, defendant's contention that Sergeant Spearman lacked the authority to enter the cell is not given weight, as he was in fact the senior staff member on site at the time of the incident.
13. Following its investigation of the incident in question, defendant terminated Sergeant Spearman, who was found to have used excessive force in violation of its Use of Force policy. This policy is part of the record, marked as Defendant's Exhibit (3). Defendant contends that because of this violation of policy, Sergeant Spearman was acting outside of the scope of his employment at the time of the incident, and that consequently, defendant cannot be found to be legally responsible. However, regardless of the degree of force used by Sergeant Spearman, at the time this incident occurred, he was providing an appreciable benefit to defendant by assisting others in the cell with plaintiff while her restraints were being secured.
14. Also in its internal investigation, defendant concluded that Sergeant Spearman had acted "intentionally," and an investigation conducted by the North Carolina State Bureau of Investigation resulted in Sergeant Spearman being arrested and charged with Assault. These facts, defendant contends, conclusively establish that Sergeant Spearman's actions cannot be found to have been negligent, and that therefore, plaintiff's claim falls outside the North Carolina Tort Claims Act. However, the undersigned is in no manner bound by defendant's own conclusions regarding this incident, or the fact that he was charged with, or even convicted of a crime that includes an intentional act as an element. Under North Carolina Law, even when an employee named in a State Tort Claim intends to act violently in restraining someone, they may be found to have acted negligently if their use of excessive, violent force was not intended.
15. At the time of the incident on 30 March 2001, defendant, by and through its employees, owed a duty to plaintiff to exercise reasonable care in its treatment of plaintiff with the use of restraining measures and otherwise.
16. In this matter, it is admitted that Sergeant Spearman's use of force was excessive. Based upon the totality of the credible evidence of record, the undersigned finds that in his efforts to restrain plaintiff on 30 March 2001, Sergeant Spearman did not intend to use excessive force, but rather acted spontaneously.
17. On 30 March 2001, by and through its employee Sergeant Tony Spearman, defendant breached its duty to exercise reasonable care in its treatment of plaintiff with the use of restraining measures and otherwise, and was therefore, negligent.
18. Plaintiff, who has an IQ of fifty-nine (59), was in the process of having 4-point restraints applied at the time of the incident giving rise to this claim. Based upon these factors, and the totality of the credible evidence of record, the undersigned finds that there were no actions or inactions on the part of plaintiff that constituted contributory negligence in relation to the incident occurring on 30 March 2001.
19. Following the spontaneous, closed fist blows, plaintiff's face and nose were bleeding severely to the point that her bed was soaked in blood. Once her helmet was removed, it was revealed that plaintiff's eyes were swollen. Initially, plaintiff was transported to the infirmary, where she was examined and treated by Dr. Obj C. Umesi. Due to the nature of her injuries, plaintiff was then transported to Wake Medical Center. Plaintiff underwent a CT scan that revealed that she had sustained a nasal fracture and medial orbital blowout fracture of the right eye. Plaintiff's nasal injury required her to undergo a nasal septal fracture surgery on 21 May 2001. As the result of her right orbital fracture, for a period subsequent to the incident, plaintiff was unable to fully open her eye, had limited side to side movement, and experienced blurry vision.
20. As evidence of the extent of plaintiff's injuries, the undersigned notes the following medical expenses incurred outside of defendant's facility: Wake Medical Emergency Room-$1,836.06; Carolina Medical Associates-Referred by Dr. Umesi for examination of right eye and nose-$1,581.00; Critical Health for Anesthesia-$777.00; Raleigh Pathology-Interpretation and diagnosis of nasal contents -$15.00, and; Wake Medical Outpatient-Open reduction internal fixation of nasal septal fracture $3,320.25, for a total of $7,529.31.
21. As further evidence of the extent of plaintiff's injuries, the undersigned notes the following dates of medical treatment received by her within defendant's facility: 30 March 2001, 2 April 2001, 11 April 2001, 17 April 2001 and 26 April 2001 by Dr. Obj. C. Umesi; 3 April 2001 and 10 April 2001 by Dr. Toley in the facility's Eye Clinic; 30 March 2001, 26 April 2001 and 30 April 2001 by Dr. Kim Brydon, a Psychiatrist; 20 April 2001, 26 April 2001 and2 May 2001 by Dr. Elizabeth Aston, a Staff Psychologist II, and; 1 April 2001 and 30 April 2001 by Dr. Martha Barham, also a Staff Psychologist II.
22. In addition to these specific dates of treatment received within defendant's facility, plaintiff received ongoing medical and psychological treatment. For her psychological condition, staff nurses from defendant's Mental Health Service examined plaintiff periodically, while the condition of her physical injuries was checked at fifteen (15) minute intervals. Plaintiff's injuries also caused her to experience extensive pain and suffering.
23. Defendant's negligence, by and through the actions of its employee, in failing to exercise reasonable care its treatment of plaintiff with the use of restraining measures and otherwise was the proximate cause of the injuries, and pain and suffering sustained by plaintiff.
 ***********
Based upon the forgoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Because at that time of the incident giving rise to this claim Sergeant Tony Spearman was providing an appreciable benefit to defendant by assisting others in the cell with plaintiff while her restraints were being secured, he was at that time acting within the course and scope of his employment with defendant. G.S. § 143-291, et seq.
2. Under North Carolina Law, even when a employee named in a State Tort Claim intends to act violently in restraining someone, they may be found to have acted negligently if their use of excessive, violent force was not intended. Jackson v. Department of Crime Control and Public Safety, 97. N.C. App. 425, 388 S.E.2d 770 (1990). Based upon the totality of the credible evidence of record, the undersigned concludes that in his efforts to restrain plaintiff on 30 March 2001, Sergeant Spearman did not intend to use excessive force, and therefore, his actions fall within the parameters of the North Carolina Tort Claims Act. Id.; G.S. § 143-291,et seq.
3. By and through the actions and inactions of its employee, defendant breached its duty to exercise reasonable care in its treatment of plaintiff with the use of restraining measures, and was therefore, negligent. G.S. § 143-291, et seq.
4. There were no actions or inactions on the part of plaintiff that constituted contributory negligence in relation to the incident occurring on 20 March 2001. Id.
5. Defendant's negligence in failing to exercise reasonable care in its treatment of plaintiff with the use of restraining measures was the proximate cause of plaintiff's injuries, and pain and suffering sustained. Id.
6. As the result of defendant's negligence, plaintiff sustained damages for which she is entitled to be paid by defendant $50,000.00. Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay damages in the amount of $50,000.00 to plaintiff as a result of its employee's negligence occurring on 30 March 2001.
2. Defendant shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER